which is number 09-1997 Byers v. Intuit Inc. et al., Mr. Martin, Ms. Hagley, and Mr. Ryan. Good morning, and may it please the Court, my name is Thomas Martin. I represent the appellants, the plaintiffs below, Stacey Byers and Deborah Seltzer and the class they seek to represent. I would like, with the Court's indulgence, to reserve five minutes of my time for rebuttal. Mr. Martin, would you favor me, please, by addressing the antitrust count first? I would, Your Honor. In fact, that had been my intention. Oh, good. Go ahead and do it then. I think it's significant to start with the fact that the District Court, through Judge O'Neill, actually held that the plaintiffs had stated a plausible claim of a violation of the Sherman Antitrust Act. The plaintiffs alleged that the corporate defendants, this count does not involve the Internal Revenue Service, only the corporate defendants are included because the Internal Revenue Service clearly has sovereign immunity under the Antitrust Act. But the complainant alleged that the defendants had agreed amongst themselves that no one member of the Free File Alliance group would provide free services to more than 50 percent of the eligible taxpayers, and that the group as a whole would not offer free services to more than 70 percent of the taxpaying public. I'm going to interrupt you for just a moment, and I hope this doesn't distract you. But the point that I wanted to hear you discuss was the fact that this case was dismissed under 12b-6, which meant that the District Court had to take all of the allegations that the plaintiff made as true. Is that correct? That is correct, Your Honor. Except here, there was attached to the complaint, however, for the Sherman Antitrust Act, I call it the Inspector General's Report. And the Inspector General's Report included, at one point, the response of the Internal Revenue Service so that the District Court had before not only the Attorney General's Report, which said, this doesn't meet the Atterberg standards, but the IRS report, which said, oh, yes, it does. And we aren't hindered. We have done what our policy says. We are the policymakers. And therefore, the exception, which the Supreme Court has found, is not applicable here. That was part of the complaint. Now, what do we do with something like that? Do we say that's a disputed fact? Do we say, no, the IRS is the policymaker. They ought to know what their policy is. And they affirmatively state that they have not done anything amiss. Or do we look at the Attorney General's Report? Well, Your Honor, I think the answer is you have to look at the facts in the light most favorable to the plaintiffs, which would be the conclusions that is in the Inspector General's. That's not what the IRS said. That's correct. The IRS said something different. And we can't just ignore that, can we? I don't believe that it's appropriate at a pleading stage, Your Honor, to make a decision. But when you include it in the pleading. Well, it was not included in the plaintiffs' pleadings. The plaintiffs included the TIGTA report. It was furnished by the defendants as something that was appended to the TIGTA report and certainly was appropriate for the District Court to look at it. But it's important, I think, to look at actually what the IRS response said. It didn't say that this agreement among parallel competitors to restrict output was something that we directed. What Judge O'Neill said is from language in the IRS response, he, I think I'll look for his exact words, he said that the language suggests that the restrictive output may have been something that the IRS asked for. But I think it's important to back up and look at what is the otter tail case. Judge O'Neill said that the otter tail exception to the exception to the antitrust rule, so we're dealing with an exception to an exception, requires a finding that the conduct, which is the core of the antitrust violation, was inserted at the insistence of the private party and was a hindrance. Well, otter tail didn't actually say that. What otter tail said is, and if you look at the facts of otter tail, it involved otter tail was a power company that had refused to deal with local municipalities. It refused to deal with its former customers. I'm sorry? It refused to deal with its former customers. That's correct. And basically, wasn't it blaming the Bureau of Reclamation? Correct. It said that under our contracts with the Bureau of Reclamation, we don't have to deal with the municipal power companies. And what the court said, the Supreme Court said, which really should not be remarkable, is that the Bureau of Reclamation has no power to grant immunity to the antitrust laws. Similarly here, the Internal Revenue Service has no power to grant immunity from the antitrust laws. It's only where a regulation or an action of the federal instrumentality is consistent with congressional policy and therefore has the force of law that you look at whether or not the actions taken pursuant to that should be granted immunity from the antitrust law. So I think, first of all, that the requirement that there must be insistence and that there must be hindrance is not really in otter tail. And then if you look at what the pleading requirements are, I think you need to focus on the fact that this immunity defense is an affirmative defense, that the defendants bear the burden of pleading and proving on. What Judge O'Neill did was give that burden to the plaintiffs in this case. But it's part of the complaint. This is what concerns me. The IRS response, Your Honor, respectfully, is not part of our complaint. The complaint alleged as a fact that the restriction on output was an agreement amongst the corporate defendants that found its way into the agreement with the IRS, but it was an agreement independent of that contract with the IRS. You mean to tell me that if somebody attaches to a complaint a contract, the court, of course, can look at that contract. If the contract, however, doesn't have all of the provisions and the other contracting party says, hey, wait a minute. What you've got there is only a part of what you should consider. This is the rest of it. And the IRS puts in the very things that the inspector general has characterized as not being the IRS motivation or the IRS actions. It says they were our actions. Here they are. This is the whole thing, that the court can't consider that on a 12b-6? I did not say that, Your Honor. The court can consider what is part of the pleadings. My point here is that the attachment of the TIGDA report was not intended to have the plaintiff's claim arise out of the TIGDA report. So it's very different than the contract situation where you're pleading, your claim arises out of the contract. The purpose of attaching the TIGDA report was to lend plausibility to the allegations, the factual allegations which are in the complaint, which are that the restriction on output was an agreement amongst the corporate defendants and that it's only in the contract with the IRS as a matter of giving the imprimatur. Mr. Martin, the moment that that's attached and then made complete, you can't expect the court to ignore it. I mean, I realize that you just put the Attorney General's report in to buttress. Inspector General. What? Inspector General. Inspector General. I'm sorry. The Inspector General's report to buttress your complaint. But the moment that you do that and it is made complete, it presents the very problem that I am concerned with. I want to know how, not only in this case, but how we treat something like that and what the ramifications are because I must tell you that I feel it does not present a factual problem between the Inspector General and IRS. I think what it does is to supply the missing ingredient, which the court used to dismiss the complaint. And you've got to persuade me otherwise. Yeah. And I think the key, Your Honor, is whether or not our claims arise out of that document. And again, going back to the contract analogy, if I submit a partial contract in support of a claim that's in the complaint and the defense says you missed page three, which gives us an out on the contract claim, clearly that is an issue that's ripe for decision on the complaint. If the language of the contract indeed gives the defendant a complete defense, then that's fine. We're not dealing with a contract claim here. We're not dealing with a claim that says what the Inspector General said is what gives us a right of action. The Inspector General is only included to lend plausibility under the Twombly case that the court below put the burden on the plaintiffs to prove around an affirmative defense. Now, query whether that's appropriate to begin with, and there's decisions that have gone both ways to whether Twombly even applies to an affirmative defense from the defense standpoint. But what the court here did is require that the plaintiff plead specific facts to get around an anticipated affirmative defense. And we think we did that. When you only plead a certain portion of the specific facts in a given transaction or report, and I would consider the IRS response part of the report, you have to put in the whole thing. Your Honor, I have no quarrel with the inclusion of the IRS response. All that does, however, is show that there is a factual issue here. No, it doesn't. Because the issue here is what did the IRS think of this? And I think the IRS response shows that they did not consider that it hampered the initiative. Respectfully, Your Honor, I don't believe it's at all what the IRS thought of this. It's whether the IRS was acting pursuant to a congressional mandate and that this output, the anti-competitive conduct that we're talking about, was required by a policy enacted by Congress. That's the issue here. And whether the IRS thought it was a good idea or not a good idea, a hindrance or not a hindrance, that doesn't supply them with the authority to effectively grant immunity to antitrust enforcement here. So, I mean, I think that's the key is we have a complaint that alleges plausibly an antitrust violation. The defendants have raised an issue regarding their immunity under the conduct-based immunity line of cases. And we think there are numerous issues of fact regarding that and that the defendants ultimately bear the burden on it. And the fact that the IRS in sort of an offhand way suggests that maybe they're okay with this. Obviously, they're okay. They signed the agreement. That's not the issue, however. Let me just, before we get off to the first issue, Marina, if you had three minutes, please. What evidence do you have that the 2005 agreement was a product of insistence by the corporate defendants? And actually, to go further, somehow that agreement hindered IRS policy.  In terms of evidence, Your Honor, we don't have a lot of evidence because The commissioner says otherwise. I don't think the commissioner says otherwise. He says that they were okay with it. The inspector general clearly says it was a clause that was put in, he doesn't use the word insistence, but that it was the corporate defendants' desire and that the IRS acceded to that desire based on their fear that without this restriction on output, the alliance might fall apart. They might not get a new agreement. So I think that's really the only record we have is what's in the public record. We do not have because we haven't taken any discovery exactly who said what to who and how this all came up and what the correspondence was. Those are the things that I think need to be explored in discovery here. We know from the inspector general's report, which is not contradicted on this point by the IRS, that it was the corporate defendants who raised this issue, desired it. The original agreement, the 2002 agreement, did not have any restriction on output. So clearly it was not something that the IRS needed in order to fulfill its mission here, but it was something that the IRS acceded to because of a fear, according to the inspector general. Now, and in the response, what the IRS said is, well, it's not a bad thing from our perspective. Well, that's fine, but if it violates the antitrust laws, the fact that it's not a bad thing to the IRS is immaterial, I would submit. Any other questions on the Sherman? No. On the first claim, where is there anywhere in the tax code that requires the IRS to provide for the electronic filing of taxes? There's a goal, but is there anything that requires it to provide for it? There is not, Your Honor, anything that requires them to provide electronic filing. Isn't that a scenic one on, a precondition to what you need to prove here? No, I don't believe so, because what is in the tax code is a clear requirement that the IRS has the sole responsibility to collect and process tax returns. And I think the issue here turns on the difference. This isn't collecting and processing. This is putting together the actual returns that need to be sent in, and the duty there is on behalf of the taxpayer. That is the defendant's argument, Your Honor, and I believe it is contrary to the facts, certainly as the facts are alleged in the complaint, and I think as the facts exist. If all the corporate defendants did when they engaged in e-filing services for which they charge a fee, would simply transmit the return that's been prepared by the taxpayer to the IRS, there would be no need for them to be in the equation. I see that my time is up. In other words, it's very different than the FedEx example or the post office example. When you have a paper tax return and you put it in the FedEx envelope and mail it to the IRS, FedEx doesn't open it up and verify the signature and then recompute the information so that it's in a different format and aggregate it with other taxpayers. But here in the e-filing system, they do. They have very specific responsibilities to verify the signature, and, again, quite frankly, we don't know all of the things they do. The published literature, however, clearly indicates that they process the returns. One of the places that's very clear is in the regulations that determine who can participate as an e-filer. The IRS requires that they have processed 25,000 returns in the prior year. So it's not just transmission of the information. It's an actual processing, and that's the government responsibility. And the government could certainly, the IRS could certainly have a subcontractor do it, but it's the charging of the fees for providing that governmental service that we challenge. Thank you, sir. Thank you. Here. Ms. Hagley. Okay, you, Mr. Ryan, have split your time ten minutes apiece. Is that correct? That's correct. And after you announce your name, then we'll figure out what you're going to cover then. You'll tell us, I should say. My name is Judith Hagley. Good morning, may it please the Court. I'm from the Department of Justice representing the Internal Revenue Service on appeal, and I was planning to address the user fee issue, and Mr. Ryan representing Free File Alliance was going to address the antitrust issue. Would the Court prefer that we switch the order since you began with antitrust? I'd like to hear Internal Revenue Service. I want to hear from you, unless by calling you first. That's fine, you can go first. That's fine, I'll just briefly address the user fee issue and then let Mr. Ryan address the antitrust. Would you address the issue we were talking about first on the Sherman Antitrust? Well, no, he's going to address the, Mr. Ryan will address the antitrust. Yes. Oh, he's going to? Yes. Including the IRS response? No, I think she can address the IRS response to that, and we can get into that. Why don't we deal with that first? What was the IRS response to the 2005 agreement? Well, the IRS response that was included in the Inspector General Report was that the IRS had incorporated the income restriction in order to maintain the viability of the free file program so that the IRS could comply with Congress's direction from the 1998 Restructuring and Reform Act to cooperate and encourage the private sector increased fee filing. Mr. Martin says you did not follow, you did not have congressional authorization. That's the way I understood his response to my questions. Well, we did. The Congress in 1998 told the IRS, directed the IRS to cooperate and encourage the private sector to increase e-filing, did not direct the IRS to provide its own electronic filing capability for taxpayers, and in working with the Free File Alliance, the IRS did what it thought was best, made the policy choice to have this particular income restriction, which the district court correctly recognized was modest, because 70 percent of all taxpayers were going to be eligible for not only free filing, but free tax preparation services, and by maintaining the viability of that alliance, the IRS thought that this agreement, which, by the way, was extended last week. You know, as our brief pointed out, the 2004, October 30th, I think, it was on Thursday that the agreement was extended into 2014. Mr. Ryan can provide more details if the court is interested, but that document will become publicly available on the IRS website soon. Now, without getting into what Mr. Ryan is going to be talking about necessarily, when it was proposed that you could have a problem if somebody has more than a 50 percent market share, because the alliance may fall apart, if you will, what was the IRS's response to that? The IRS was of the view that there needed to be a uniform restriction, and exactly how it came up with the numbers 50 and 70, I'm not sure, but it thought that that was a good compromise number to maintain the viability. The prior year, in 2004, as we indicated in our brief, the IRS had received questions from the Congressional Appropriations Committee saying, look, the purpose of this program, of the free file program, was to help out low-income taxpayers, and we understand that there's now a member or two in the free file alliance that does not have an income restriction. I believe in the beginning, in 2002, all the members had various income restrictions, and Congress learned that one or two had not, and asked the IRS to look into that. I'll let Mr. Ryan address the rest, if that's all right, of the antitrust issues, but the user fee issue is, frankly, quite simple. As the court recognized, no law requires the IRS to provide electronic filing for taxpayers. The plaintiff's argument that law requires the IRS to collect taxes and process tax returns doesn't make electronic filing a government service. Taxpayers have to file their return. It's their responsibility under the code. They're responsible for the cost. The IRS has never been responsible for the cost. There are some legislative proposals. The one thing you've been given was there was a goal, if you will, was there not? Yes, that's right. The goal was what, 80%? 80% by 2007. And we're not quite there. We're not quite there. The latest numbers I've seen were up to 67%. And I just want to dovetail this in with the first part, at least the IRS's role in the antitrust claim. What IRS policy was advanced by limiting the free file program to 70% of taxpayers? With that in the IRS's view. In other words, doesn't that frustrate the goal that Congress gave you of achieving 80% participation by filing e-mail, or by e-filing? I don't think so because the companies are still able, outside the free file program, to provide free services, fee-based services, whatever type of services that they like. The free file program just got a number of companies to agree to provide not only free filing, but free tax preparation services for 70% of all taxpayers. And some taxpayers, like my son, e-file after doing their own returns. That's correct. That's correct. Unless the Court has any other questions on the user fee issue. Thank you very much. May it please the Court.  lawyers in the courtroom who have exceeded their time to me to make the argument today. With me in the courtroom are the attorneys for Block, Mr. Woods, Mr. Stemple, and Mr. Hewitt for Intuit, and my partner, Jason Levine. My name is Stephen Ryan. I'm here representing the Free File Alliance and, by implication, the individual companies that provided free services to the taxpayer. I'd like to go directly to you. If you would adjust the microphone. Oh, yes, sir. Thank you. The one thing that appears that there's at least some tension. The argument, the district court dismissed the IOAA claim because it concluded that the e-file program was non-governmental in nature. The government wasn't required to have such a program. Now, if the district court's correct in that holding, and I think you may surmise that we tend to lean that way, then the corporate defendants, they shouldn't be, it would seem that they shouldn't be entitled to implied conduct-based immunity because the IRS can't authorize their private anti-competitive conduct. So let's start with what's actually occurring here. This is the commissioner's website, the IRS commissioner. This is the 800-pound gorilla of the United States government, the IRS commissioner's decision about what goes on his website. In the 2002 agreement, Charles Rezati, the Senate-confirmed commissioner of the IRS, decided what was in the government's interest, and in 2005, the signature that's on the 2005 agreement is not some clerk in hoedunk in the BLM case with regard to Otter Tail, but it is the IRS commissioner, in that case, Mark Everson. And in fact, in the new agreement that was signed last week, it is the commissioner again signing on behalf of the United States government. So the first thing I think what we have to do is wipe off the board the notion that there's any Otter Tail problem here. The Otter Tail case was a case brought by the United States against the company alleging anti-competitive. Otter Tail, I concede, are different acts. They're using the monopoly that was given to them by the government in order not to service prior customers, and they're claiming that they're doing so as a result of government authority. But here, the point is that if the first issue is one that says, that there is no requirement of the government to have the processing and filing of taxes, or processing, but the filing of taxes, preparing and filing. Preparation. Preparation and filing. And here, this all relates to preparation and filing, and now you're in effect trying to – are you not? No. Let me take the point that the court has. First of all, in the IOAA claim, my brother, the appellant, has alleged that we become agents of the IRS if we are tax software companies in the public that collect the returns and deliver them to the IRS door. That is simply not true as a matter of law. Not as a matter of fact, but as a matter of law. But you're saying you're not an agent because there is no government requirement in any event, and this is just merely allowing you to go out and perform a third way of filing tax returns. That's exactly right. And, of course, if you prepare your taxes using the software or using the Internet, you can print the return and mail it in. And there's never been any outsourcing.  The district court appropriately said that's not true because the United States Postal Service, you have to put a stamp on the envelope to get it to the IRS the way they do. And when each of us, every one of the persons in this courtroom, including this court, has stapled a check to their tax returns in the old days and mailed it in, even if you electronically file now, and the IRS tells you exactly how you do that. You staple it on the upper left-hand side of the form because that's how IRS tells you. So that the requirements of how you electronically file, if you're one of the companies who's been authorized to e-file to the IRS, if you do that, there are certain conventions that you have to file. And those are described in documents from the IRS website. That does not make those companies agents of the IRS, which is the synchronon of the argument here. It does make those companies felonious and they can go to jail if they take the information from what will become a tax return the minute that it's delivered. Even before it becomes a tax return, they become responsible under United States criminal law. Are you not arguing that you have immunity because of direction given to you by the government? Absolutely. Absolutely positively. I've been directed by the commissioner that if I want to use his website, which belongs to him, it doesn't belong to me, that he says this is the way you're going to do it. And if the court will indulge me, if we look at the document that Judge Garth, you began with and asked my brother about, let me read you, and I think there's a very important clause in that document. There's one in the record at page, it's in the record at page, I have the page site right here. I actually have copies that are blown up that the court could look at that I brought to court. But let me read it. It's at page 33, bear with me a second. It's actually at page, it's at page 605 in the record. Wait a minute. What about page 33? I apologize. Page 33 is the numbering from the management response. That's right. Okay. What page am I? If we were in the record, Your Honor, I'm going to refer to three portions of the management report beginning on page 605, 606, and 607. And this document. Where do I get it? Sure, Your Honor. If you will. Absolutely. I actually have better copies here because it's hard to read that one. I'm glad to. Why don't you give them to him? Oh, boy. Yeah. This is hard to read. Skiborski. I marked it off, but I had problems reading it. Judge, you know, my eyes are tired and I couldn't read it. Now there's three portions of this that absolutely demolish the plaintiff's case. And the plaintiff can't avoid this. Although they tried to avoid it below by not providing this in their record, it was eventually put in the record. And if you turn, the one that I think is the most important, and we have not focused on adequately, is the paragraph that begins at the bottom of the second page. And it says the likewise paragraph. And to go directly to the heart of it, the alliance contract, and I'll say parenthetically, the contract being referred to as the 2002 agreement, the alliance contract only guaranteed coverage to 60% of the taxpayers. Let me stop for a second. The 2002 agreement says that the companies had to cover 60%. By the way, it didn't say which 60%. So if companies all clustered at the top end to give Bill Gates and Warren Buffett a free return at the top end, it would not meet the IRS goal. What the IRS goes on to say here is that they say universal coverage was not guaranteed, although individual companies did make their services available to all taxpayers. Okay, right after that. Universal coverage was not guaranteed. These individual members made no guarantees that their companies would continue to provide this level of service in the future, nor did the alliance endorse or support the continuation of this level of service. Although free tax preparation and filing was guaranteed to all taxpayers. Offered. Oh, I apologize, Judge. Offered. Offered to all taxpayers. I get so excited. It was for a limited time and not guaranteed by the alliance contract. So if the court will bear with me, the 70% requirement that is in the 2005 agreement said you must cover the lower taxpayers, not the higher taxpayers. The IRS made a policy choice, and it was the commissioner's policy choice, that what he wanted was 100% coverage of the lowest 70% rather than the possibility that with the coverage that was in the 2002 agreement, it could all be clustered at the top end. There are several other portions of this document that equally are dispositive in showing what the commissioner's rational government purpose was. So if we look and compare the law that comes to us in namespace, particularly, namespace and the other implied antitrust immunity cases, make it clear that when the commissioner signs the document in 2005 that does this, it is not, quote, the cartel of which there's literally no proof that there was ever a cartel. There's no proof, by the way, in the record in any way except the allegation that the companies pled with IRS to do this, but we should assume they should. Now, there is one issue. My time is up. But there's one issue that I think has to be raised for this Court, which is Knorr-Pennington. The implied antitrust immunity ground is absolutely correct in the district court's opinion. The district court did not rule on Knorr-Pennington, and this Court, to make this decision correct, should rule on Knorr-Pennington. And the Bedell case, Judge Garth, compels at this stage that it do so. And let me just complete my argument by saying here is why. If you do not rule on Knorr-Pennington. It's based on petitioning of the government. That's right. You petitioned the government? The petitioning of the government. Read the complaint. Paragraphs 20, 21, 77, 78, 74, 73, 80, and 81 all say that the conduct here is because of the 2005 agreement with the IRS. They also say that we petitioned for that. Now, here's what happens if you return this case and let it go to the next stage. It's truly going to get in the IRS commissioner's suit. It's the IRS commissioner whose testimony will be required. It is the IRS commissioner from 2005 who will have to come back and defend the And under Knorr-Pennington, we are entitled to have asked our partner in the MOU, our partner in this program, to make rules that made sense for us. And that's all that's in this complaint. Wait a minute. If the district court correctly rejects the appellant's argument under Otter Tail, why do we have to deal with Knorr-Pennington? You don't have to because you get the right result. But I think there's a very important issue for the future about government programs. This decision was made by the commissioner. And if you don't uphold the right to petition the commissioner, as an additional and equal ground here, I think you're missing part of the help that the court gives the people of the future. This issue was fully briefed below. The judge below said, since I've done it on one, I don't have to reach that issue. But I think, actually, this court ought to reach that issue. And it is fully briefed up in front of you. But normally, I mean, just one of the maxims of judging is don't decide today what can be decided tomorrow, for tomorrow it may not need to be decided. What you're saying is somehow tomorrow you think it will need to be decided? I think, by the way, if there's ever another challenge to this 2005 agreement or to the way that the IRS commissioner made his decision, which is absolutely attached to the complaint and the management response, it's absolutely necessary. Let me make one last point, and I know I'm over time. The Inspector General Act. The Inspector General Act actually dictates to this court that you read the IRS response as the vital document. Congress directed in the Inspector General Act, particularly in the 1988 amendments from the Governmental Affairs Committee in the United States Senate, that the management response had to be attached to each thing, because otherwise you wouldn't need a commissioner of the IRS. All you'd need is an Inspector General, because the Inspector General's word would be the agency's word, and it is not. He is a third-party kibitzer on this issue. But it allows us to get rid of this case because it does contain the exact statement of the IRS on this issue. Thank you very much. Mr. Martin. Please, the Court. First, very briefly, with the Newark-Pennington Doctrine. The issue here, the harm here, was not caused by any petitioning of the government. We don't allege that. They have the right to petition the government. The issue is, does the Internal Revenue Service have the ability to waive the antitrust laws under these circumstances? And I submit the answer is clearly no. Well, I mean, at its base level, does negotiations, do negotiations with the government constitute petitioning of the government? I would have to say that under Bedell, this Court has held that they do, to a certain extent. But the key to Bedell is that it wasn't the negotiation, the petitioning, that ran afoul of Newark-Pennington. It was the fact that the result of that was government action, direct government action, that the plaintiffs had alleged caused them their anti-competitive harm. The tobacco industry petitioned the state governments to enact laws that would penalize producers who were not part of the settlement agreement. So it was the direct government action that caused the harm. Here, we have a completely different situation. It's not the petitioning, and it's not the government action that caused the harm. It's the agreement of the private corporate defendants to act in an anti-competitive way. And I think that the language that counsel just read from the IRS report is a bit of a red herring here. It says that the IRS did not guarantee there would be 100 percent free filing at any point in time, and that's certainly true. But what the antitrust evil is here is the agreement among the horizontal competitors to restrict the output to say we will not provide free services to 30 percent of the taxpaying population under any circumstances. It's that restriction on output which is the economic harm, and it does not drive, it does not result from and it does not drive any legitimate policy of the Internal Revenue Service. The restriction on output serves only the anti-competitive desire of the participating private defendants. So it frees them from one of their members saying, you know what, we can sell our software. We don't need to charge for filing service. So if you buy our software, the filing service is free. That's the anti-competitive harm here. It has nothing to do with whether low-income people are favored and get more free services. It has nothing to do with the IRS policy. It's simply that they have agreed amongst themselves in a way that hinders competition. If I could just briefly go back to the user charge issue here. It's repeatedly in the briefs and in argument stated that the plaintiffs are alleging that the collection and transmission of tax returns is a government service. And that is simply a misrepresentation of the plaintiff's claim. If you look at the complaint, the First Amendment and Second Amendment complaint, it very clearly says. What do you suggest is the government responsibility here that's being undertaken by Free Alliance? The actual processing of the returns, Your Honor. And they do more than just deliver them. They process them. They check the signatures. They aggregate the numbers. They put it in a format that it can be transmitted in bulk. If I go to my accountant and my accountant prepares my return and sends it in by FedEx, that's not processing, is it? It is not, no. And if it isn't? Well, your accountant is preparing, but it's not processing. But isn't this just another way of getting it to the IRS instead of FedEx? It's more than that, Your Honor. I'm sorry. I didn't mean to interrupt. It's just an e-filing. It's a way of getting it from here to there. It's more than that. If it was only getting it from here to there, I could do it from my home computer and just simply transmit it as a PDF file. But, in fact, as Ross said, her son does do it from his own computer. He does not. He does not without going through one of the corporate defendants. And that's clearly alleged in the complaint. And it's an actual fact that an individual cannot e-file directly with the IRS. You must go through one of these private corporate defendants here. And that is the reason that we believe that the APA does apply here. And what do the defendants do to it in addition to receiving it? You say they check the signatures.  What else do they do? They assign a unique identification number to the data. And then they transform the data, Your Honor. And I have to tell you, I don't know exactly how they transform it or what that process is. The defendants don't go into the detail that Judge Ambrose's accountant does when he says to him, when he says, is this all the income? Didn't you get $30 more on this? Didn't you pay out some additional clarity? No, what I say is I usually say that for deductions, not income. I beg your pardon. I don't like to take down the income. Yeah. Take out the deductions. The processing that an accountant does is vastly different than the ones that these people do in sending it by e-mail. Yes, but they don't just send it by e-mail, Your Honor. That's the whole point. They process the return. It's not the preparation. The accountant does the preparation, and that's a different issue. That's not a government function. But processing the return, collating the information, if you will, batching it, those are the functions that the IRS is given the task to do, and they have given that task in turn to these private defendants, which they are very much in their rights to do. Where in the code does it say the IRS has the function of collating and batching? It says they process returns, Your Honor, and that's, I believe, included in that definition. Process returns? Sure. But that's after they get them. That's correct. Not before they get them. That's correct. And what they've done is they've presented an intermediate step where these corporate defendants obtain them and process them and then deliver the processed data to the IRS. At least that's the allegations in the complaint, and these are the facts that we need to explore through discovery as we go forward. Thank you very much. Thank you to all counsel for well-presented arguments, very well-presented arguments. I would ask counsel if you would confer with the clerk's office and to have a transcript of this oral argument prepared with the cost to be shared by both sides. So each 50-50. Is that cost deductible? Will I? Anyway, thank you very much.